Ginger G. Mooney, OSB # 031261
Ginger G. Mooney, LLC
1017 May Street, Suite 200
Hood River, Oregon 97031
T: (541) 716-5650
F: (503) 389-1585
contact@mooneylaw.org
Attorney for Mercedes Crabtree

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PENDLETON DIVISION

| | |
|---|---|
| **MERCEDES CRABTREE,** | USDC Case No. 2:20-cv-1291 |
| Plaintiff, | **COMPLAINT** |
| **v.** | 42 U.S.C. §§ 1983, 1985 (Violation of Civil Right under Color of Law), Eighth Amendment Failure to Protect, Fourteenth Equal Protection, Failure to Supervise, PREA Violations, Injunctive Relief, and Equal Protection |
| **COLETTE PETERS**, Oregon Department of Corrections (ODOC); **BRIAN BELLEQUE**, ODOC Deputy Director (past); **HEIDI STEWARD**, ODOC Deputy Director (current); **PAULA MYERS**, Superintendent Coffee Creek Correctional Facility (CCCF); **MICHAEL GOWER,** ODOC Assistant Director of Operations; **ROB PERSSON,** ODOC Westside Institutions Administrator; **ERICKA SAGE**, ODOC PREA Coordinator; **DAWNELL MEYER**, ODOC Behavioral Health Services Administrator; **RICHARD STEPHEN ALBERTS, JR.,** ODOC Correctional Officer; **JASON BATTIN**, ODOC Correctional Officer; **ROMERO YANEZ**, ODOC Correctional Officer; **SHERRI KILGORE**, ODOC Correctional Officer; **ANTHONY ROSS**, ODOC Correctional Officer; **JACK ROWLETT**, ODOC Correctional Officer; **TANYA SIMMONS**, ODOC Correctional Officer; **JENNIFER ELGIN**, ODOC/CCCF counselor; **T. PLUMBER**, ODOC SUI Investigator; **ALEX DORAN**, ODOC Correctional Officer; **JASON WILSON,** ODOC Correctional Officer; **EDGAR** | **DEMAND FOR JURY TRIAL** |

**1   – COMPLAINT**

**MICKELS,** ODOC Correctional Officer;
**JASON WELLS**, ODOC Correctional
Officer; **SHERYL KERR**, ODOC
Correctional Officer; **ALANA BRUNS**,
ODOC Correctional Officer; **CLARK
BARKELL**, ODOC Correctional Officer;
**JAMIE BERRINGER**, ODOC
correctional officer; **MARTIN IMHOFF**,
ODOC Correctional Officer; **JOHN/JANE
DOE**, ODOC/ SIU Investigators;
**JOHN/JANE DOE**, ODOC/CCCF
Correctional Officers; **JOHN /JANE DOE,**
Security Staff; **JOHN / JANE DOE**,
ODOC Medical Staff; and the **STATE OF
OREGON**, each sued in their individual
and official capacities,

     Defendants.

## COMPLAINT AND DEMAND FOR JURY TRIAL

    Plaintiff, by and through her attorneys, brings her complaint herein. Plaintiff states and

alleges as follows:

## INTRODUCTORY STATEMENT

### 1.

    This suit is filed by plaintiff under 42 U.S.C. § 1983 for actions by the named defendants

in failing to follow federal and state laws and administrative rules concerning the protection of

plaintiff, a vulnerable person, who was an Adult in Custody (AIC) in Coffee Creek Correctional

Facility (CCCF), an Oregon Department of Corrections (ODOC) facility, until January 2020.

Plaintiff is currently housed at the Grant County Jail as an ODOC AIC. Plaintiff was sexually

assaulted, harassed and used by Correctional Officers (CO). Defendant failed to provide adequate

supervision and training of staff. ODOC further failed to provide adequate safeguards and

protections for plaintiff from defendants Mickels, Wells, Alberts and Battin, Correctional Officers

who attempted to or raped, sexually harassed and intimidated plaintiff and, to our knowledge,

another female AIC from 2018 until 2020 while employed at CCCF. Further, plaintiff was discriminated against and physically harmed by Alberts. Defendant failed to provide adequate safeguards and protections for plaintiff from Alberts. Defendants failed to recognize and respond to obvious signs defendant Alberts was grooming female prisoners and had a pattern of sexual predation which was known to many staff members, including other correctional officers on the unit, security staff, and management at CCCF. Defendants failed to provide legally mandated counseling as required by the provisions of the Prison Rape Elimination Act (PREA) for the benefit and protection of the plaintiff and subjected plaintiff to recurring psychological damage by failing to treat her ongoing psychological injuries arising from the sexual abuse.

In addition, plaintiff was subjected to unlawful full body cavity searches and suffered under unlawful conditions of confinement. Plaintiff is filing this suit in her own name but will be joined by another AIC who was also abused and assaulted by defendants Alberts and Battin. Plaintiff seeks declaratory and injunctive relief, nominal, compensatory and punitive damages, including reasonable costs, attorney's fees and disbursements, pursuant to 42 U.S.C. §1988.

## JURISDICTION AND VENUE

**2.**

Jurisdiction exists under 28 U.S.C. § 1331 because this action arises under the laws of the United States. This Court has jurisdiction over plaintiff's claims under 28 U.S.C. § 1343 because plaintiff has brought this action to seek redress for the deprivation of rights secured by the United States Constitution.

**3.**

Venue is proper under 28 U.S.C. § 1391(b)(2), because the acts and omissions alleged herein occurred in Washington County, Oregon. Further, one or more of the defendants reside in the District of Oregon and Plaintiff's claims for relief arose in this district.

**PARTIES**

**4.**

Plaintiff is a resident of Oregon and is an incarcerated individual. She presently resides in Oregon.

**5.**

Defendant Colette Peters was at all relevant times the Director for ODOC. Defendant Peters has the ultimate oversight of ODOC employees and AICs and is responsible for the enforcement and compliance with federal law, including the United States Constitution and the mandates of the Prison Litigation Reform Act (PLRA), the Prison Rape Elimination Act of 2003 (PREA), and the laws of the State of Oregon. Defendant Peters approves and signs PREA audits for every ODOC institution in Oregon. She has implemented a zero-tolerance policy for sexually assaulting AICs within ODOC by employees of ODOC. Defendant Peters has had Governor Kate Brown certify to the United States government that Oregon is in compliance in all regards and meeting all of the requirements of PREA for compliance in order to continue to secure federal funding to the State of Oregon.

**6.**

Defendant Brian Belleque, until approximately May 1, 2019, was the Deputy Director for ODOC and responsible for carrying out and implementing all policies of the Director and the

Policy Group. He was responsible for the overall safe and secure operation of all ODOC correctional institutions.

**7.**

Defendant Heidi Steward is the current Deputy Director of ODOC. She has held this position since approximately April 1, 2019. Heidi Steward is responsible for carrying out and implementing all policies of the Director and the Policy Group. She is responsible for the overall safe and secure operations of all ODOC correctional institutions. Defendant Heidi Steward was also the Assistant Director of Correctional Services.

Defendant Michael Gower is the Assistant Director of Operations. He is the direct supervisor of every ODOC Superintendent within ODOC. Defendant Gower has the authority to direct and implement changes within ODOC prisons. He oversees the budgeting for each institution and approves budget requests for security improvements within ODOC. Defendant Gower is responsible for ensuring that Oregon prisons are safe, civil and productive. Additionally, Michael Gower is responsible for institutional management, AIC transportation, security threat group management, emergency preparedness and AIC work activities. Michael Gower, as Assistant Director of Operations, is responsible for PREA compliance and the safe and secure operation of ODOC Institutions.

Defendant Rob Perrson is ODOC's Westside Institutions Administrator and is directly responsible to the operations of eight ODOC institutions including CCCF.

**8.**

Defendant Ericka Sage is the ODOC PREA Coordinator. As the PREA Coordinator she would pass along PREA audit recommendations to defendants Peters, Belleque, Steward, Gower and the CCCF Superintendent and Assistant Superintendent of Security for CCCF for

implementation.

**9.**

Defendant Paula Myers was Superintendent at CCCF during all relevant times. At all times relevant, Paula Myers was acting under the color of law and is sued in her official capacity.

**10.**

Defendant Stephen Alberts, Jr. was a correctional officer at CCCF at all relevant times.

**11.**

Defendant Jason Battin was a correctional officer at CCCF at all relevant times.

**12.**

Defendant Romero Yanez was a correction officer at CCCF at all relevant times.

**13.**

Defendant Sherri Kilgore was a correctional officer at CCCF at all relevant times.

**14.**

Defendant Anthony Ross was a correctional officer at CCCF at all relevant times.

**15.**

Defendant Jamie Berringer was a correctional officer at CCCF at all relevant times.

**16.**

Defendant Martin Imhoff was a correctional officer at CCCF at all relevant times.

**17.**

Defendant Sheryll Kerr was a correctional officer at CCCF at all relevant times.

**18.**

Defendant Clark Barkell was a correctional officer at CCCF at all relevant times.

**19.**

Defendant Alana Bruns was a correctional officer at CCCF at all relevant times.

**20.**

Defendant Tanya Simmons was a correctional officer at CCCF at all relevant times.

**21.**

Defendant Jennifer Elgin was an ODOC/CCCF counselor at all relevant times.

**22.**

Defendant T. Plumber was an ODOC SIU investigator at all relevant times.

**23.**

Defendant Alex M. Doran was and correctional officer at CCCF at all relevant times.

**24.**

Defendant Jason C. Wilson was a correctional officer at CCCF at all relevant times.

**25.**

Defendant Edgard Mickles was a correctional office at CCCF at all relevant times.

**26.**

Defendant Jason Wells was a correctional officer at CCCF at all relevant times.

**27.**

Defendant Doe was the Assistant Superintendent of Security at CCCF and was responsible along with the Superintendent for ensuring PREA compliance and that AICs were safe from sexual assault at CCCF.

**28.**

Defendants John and Jane Does are and have been Behavioral Health Services counselors at CCCF.

**29.**

Defendants John and Jane Does are security staff at CCCF who knew or should have known about Albert's behavior and unauthorized conduct.

**30.**

Defendant John and Jane Does are correctional officers at CCCF who facilitated, knew or should have known about Albert and Battin's behavior and unauthorized conduct.

**31.**

Defendants John and Jane Does are correctional officers at CCCF who facilitated, knew or should have known about Mickels' and Wells' behavior and unauthorized conduct.

**32.**

Defendant John and Jane Does are correctional officers at CCCF who facilitated and knew about plaintiff's conditions of confinement and unlawful strip searches.

**33.**

Defendants John and Jane Does are and were at all times relevant, employees of ODOC and/or other state officials whose identities are currently unknown to plaintiff. All Doe defendants have been personally involved in the violations alleged herein.  Plaintiff will amend this complaint to formally name all Doe defendants once their identities are revealed to plaintiff during discovery. All Doe defendants are sued in the official and individual capacities. All Doe defendants have acted under color of state law at all times relevant to this complaint.

**Exhaustion of Administrative Remedies**

**34.**

Plaintiff has exhausted all available administrative remedies with respect to all claims and all Defendants involved in the above-described events.

**FACTUAL ALLEGATIONS**

**(Coffee Creek Correctional Facility)**

**35.**

Coffee Creek Correctional Facility (CCCF), located in Wilsonville, Oregon and is Oregon's only prison housing female AICs. It also serves as the intake center for all prisoners entering ODOC. The facility opened in 2001 and contains 1,684 beds.

**36.**

CCCF has cell and dormitory housing, work programs, skills training, treatment programs, health services, religious service, physical plant, a central records unit and administrative areas.

**37.**

Since opening, CCCF has been the location of numerous sexual assaults, rapes and misconduct by staff against female AICs.

- 2004 – Lt. Jeffrey Allen Barcenas pled guilty to four counts of official misconduct for engaging in sex with a female AIC.

- 2008 – CO Richard Mitchell was female AICs to expose themselves to and engage in sexual favors with Mr. Mitchell.

- 2008 – CO Robert Dunlap was accused of abuse against a female AIC.

- 2009 – Mr. Paul Golden, CCCF employee was convicted of 15 counts of

custodial sexual misconduct and the State was sued by the female AICs.

- 2009 – Mr. Richard Kaleo Rick, a civilian plumber working at CCCF, convicted and the state was prosecuted for sexually abusing AICs.

- 2009 – Mr. Troy Bryant Austin, a civilian maintenance worker at CCCF, was convicted and the state was sued for sexually abusing AICs.

- 2009 – CO Darcy Aaron MacKnight was convicted of custodial sexual misconduct for having sex with a female AIC.

- 2010 – Christopher Don Randall, Food Services Coordinator, pled guilty to two counts of official misconduct for engaging in sexual intercourse with a female AIC.

- 2012 – Jeremy Joseph Veelle, Physical Plant employee, a was charged with official misconduct for sexually abusing a female AIC.

- 2012 – Shawn Jacob Riley, a civilian employee at CCCF, arrested and charged with official misconduct and custodial sexual misconduct for sexual acts against a female AIC.

- 2016 – CO Edgar Mickels was arrested and charged with first degree sexual misconduct and three counts of custodial sexual misconduct for engaging in sexual contact with at least one female AIC.

- 2017 – CO Brian Joseph Balzer was convicted of first degree custodial sexual misconduct for his conduct with a female AIC at CCCF. Mr. Balzer's victim alleges there were other victims.

- 2017 – Dr. Robert W. Snider was sued by three female AICs alleging they were sexually abused by Dr. Snider during unsupervised examinations

while incarcerated at CCCF.

• 2019 – Tony Klien, ODOC nurse, was accused by at least 12 female AICs who filed federal lawsuits against ODOC and several medical staff members of a long pattern of sexual grooming, assault, battery and retaliation for abuses committed by a male nurse.

• 2019 – Douglas Cloutier, ODOC kitchen employee, at least four female AICs filed complaints for sexual assault and battery against Mr. Cloutier.

## OREGON STATUTES

### 38.

Oregon Revised Statutes 423.020(1)(d) mandates the Oregon Department of Corrections to provide adequate food, clothing, health and medical care, sanitation and security for persons confined.

### 39.

Oregon Revised Statutes 423.075(5)(d) states the Director of the Oregon Department of Corrections shall provide for the safety of all prisoners in the custody of the department.

### 40.

On August 20, 2012, the Department of Justice issued the final rule adopting national standards to prevent, detect, and respond to prison rape, as required by the Prison Rape Elimination Act of 2003 (PREA).

### 41.

ODOC has a zero-tolerance policy for sexual abuse. The Prison Rape Elimination Act of 2003 is a federal law that seeks to eliminate sexual assaults and sexual misconduct. This law

applies to all federal and state prisons, jails, police lock-ups, private facilities, juvenile facilities, and community correctional settings. The Bureau of Justice Statistics carries out, annually, a comprehensive statistical review and analysis of the incidence and effects of prison rape. The major provisions of the standards are: general prevention planning, supervision and monitoring, cross-gender searches and viewing, training and education, screening, reporting, responsiveness planning, investigations, discipline, medical and mental health, grievances, and audits. DOC continues its efforts to maintain safety for all AICs and others inside the facilities keeping PREA as a top priority. ODOC, in AIC publications, handbooks, posters, fliers, and other types of communications with AICs, has created an expectation that ODOC will do everything within its powers to protect AICs from staff assault and that ODOC expects AICs to be respected by staff at all times.

## PRISON RAPE ELIMINATION ACT

## (PREA)

### 42.

The Prison Rape Elimination Act (PREA) became federal law in 2003. The Oregon Department of Corrections adopted the mandates of PREA in Rule 40.1.13 and was modified in September 2018.

### 43.

PREA's purpose is to provide for the analysis of the incidence and effects of prison rape in federal, state and local institutions, and to provide information, resources, recommendations and funding to protect individuals from prison rape. PREA seeks to establish a zero-tolerance policy regarding rape and sexual abuse inside correctional facilities. PREA also mandated the

publication of standards to ensure compliance and to improve prevention, detection and response strategies in addressing sexual abuse and assault.

**44.**

The requirements of ODOC Policy 40.1.13 and PREA include prevention, planning, investigation, prosecution, and provide counseling and treatment to victims. Oregon identifies itself as being committed to a zero-tolerance standard for sex abuse and sex harassment.

**45.**

The Agency PREA Coordinator is responsible for the development, implementation and oversight of the department's compliance with the PREA standards in all department facilities. Policy 40.1.13 II.A. In order for this coordination to occur the Operations Division, which Defendant Gower is in charge of, has to authorize the recommended implementation recommendations. Without the adoption, cooperation on approval of the Operations Division, the Agency PREA Coordinator lacks authority to enact change.

**46.**

The PREA compliance manager is a management staff person designated by the institution functional unit manager, with sufficient time and authority to coordinate the facilities' efforts to comply with the federal PREA standards. (Policy 40.1.13 II.F.) However, absent the approval and direction of the Superintendent and Assistant Superintendent of Security, the PREA Compliance Manager lacks operational authority to make any changes or order anything to occur differently at an institution.

**47.**

Sexual abuse of an AIC by a staff member, contractor or volunteer includes any of the following acts, with or without consent of the AIC, detainee or resident:

13  – COMPLAINT

1)    Contact between the penis and vulva or the penis and anus including any degree of penetration;

2)    Contact between the mouth, the penis, vulva or anus;

3)    Contact between the mouth and any body part where the staff member, contractor, or volunteer has the intent to abuse, arouse or gratify sexual desire;

4)    Penetration of the anal or genital opening by hand, finger, object or other instrument, that is unrelated to official duties or where the staff member contractor, or volunteer has the intent to abuse, arouse or gratify sexual desire;

5)    Any other intentional contact, either directly or through the clothing, of or with the genitalia, anus, groin, breast, inner thigh or the buttocks that is unrelated to the official duties or where the staff member, contractor, or volunteer has the intent to abuse, arouse or gratify sexual desire;

6)    Any attempt, threat, or request by a staff member, contractor of volunteer to engage in the activities described in this section;

7)    Any display by a staff member, contractor or volunteer of his or her uncovered genitalia, buttocks or breast in the presence of an AIC, detainee or resident;

8)    Voyeurism by a staff member, contractor or volunteer. (Policy 40.1.13.II.G)

**48.**

The sexual abuse liaison is a management staff person designated by the institution

functional unit manager to coordinate response reporting and monitoring of AIC abuse within the institution. The sexual abuse liaison shall be assigned as the Sexual Abuse Response Team (SART) leader.

**49.**

The SART is a team of institution staff consisting of a Behavioral Health Services (BHS) staff member, a Medical Services staff member and the sexual abuse liaison who are designated by the functional unit manager to respond to all allegations of AIC sexual abuse or sexual coercion.

**50.**

All staff are covered by the mandates of PREA and Policy 40 including all ODOC employees, OCE employees, contract service providers and volunteers.

**51.**

ODOC Policy 40 mandates that all staff "must be able to recognize the signs of sexual abuse and sexual harassment and understand their responsibility in the detection, prevention, response and reporting of an alleged sexual abuse or sexual harassment."

**52.**

Each facility is required to conduct and document unannounced rounds on all shifts to deter staff sexual abuse and sexual harassment. Staff is prohibited from alerting other staff members that the supervisory rounds are occurring.

**53.**

ODOC shall ensure that each facility it operates develops and documents a staffing plan that provides for adequate levels of staffing to protect AICs against sexual abuse.

**54.**

It is the AIC's right is to be free from sexual abuse and retaliation. AIC's can exercise this right by reporting sexual abuse and obtaining mental health services if victimized.

**55.**

Policy 40 mandates access to services, including reporting, for AIC victims of any and all sexual abuse or sexual harassment. AICs who are found to have made "bad faith" allegations of sexual abuse will be held accountable through all means available to ODOC, including discipline. It is not known to plaintiff which ODOC staff members are properly trained in sexual abuse and misconduct investigations.

**56.**

Policy 40 mandates all staff to report "immediately any knowledge, suspicion or information regarding sexual abuse, sexual harassment, retaliation by AIC or staff for reporting or staff neglect or violation of responsibility that may have contributed to such incidents.

**57.**

Policy 40 sets forth the procedures to be followed when a complaint of sexual abuse or harassment is received. The PREA Compliance Manager shall be responsible for monitoring all AICs and staff to protect from retaliation or harassment by other staff or AICs. Typically, CCCF requests the Oregon State Police to conduct criminal investigations into allegations of sexual abuse inside the prison.

**58.**

ODOC states there is to be no long-term forfeiture of services and programs for victims of sexual abuse and that the safety of the victim is paramount. AICs will be housed in the least restrictive housing, will have timely unimpeded access to emergency medical treatment, necessary

post event treatment including coordination with community hospitals, testing for sexually transmitted diseases, comprehensive information and timely access to all lawful pregnancy related medical services, and referral to Behavior Health Services and communication with a designated sexual abuse liaison regarding further information required.

**59.**

Mental health services are required to be provided for victims of sexual abuse including timely, unimpeded access to appropriate mental health evaluation services without financial cost, comprehensive information on the limits of confidentiality and duty to report, completion of a mental health evaluation to include suicide risk screening, notification of the Officer in Charge and Medical Services regarding recommended actions, and follow up mental health services.

**RESPONSE TO PRIOR PREA INVESTIGATIONS**

**60.**

Following the sexual abuse investigations noted in paragraph 29 above, many of the women victims were placed in solitary confinement, lost their jobs and/or housing, and were limited in visits with children and family. The superintendent for CCCF initiated an internal review which found that the facility had inadequate security patrols, rooms without windows or adequate surveillance, an overall shortage of surveillance cameras, and too many employees with access to limited private areas. The superintendent adopted a "Rule of Three" which prohibits entry into some parts of the prison unless three people—a mix of staff and AICs—are present.

**61.**

While neither PREA nor ODOC Policy 40 create a private right of action, national

standards as implemented by the rule create duties expected of staff. Rights held by AICs create another protected "condition of confinement" which is protected under the Eighth Amendment to the United States Constitution. PREA and the state rule also creates notice to employees of expected performance and parameters of behavior which have the impact of law.

### Mercedes Crabtree

### 62.

Plaintiff is a 26-year old African American woman in ODOC custody.

### 63.

Plaintiff entered into ODOC custody with PTSD. In 2013, shortly after plaintiff's arrival at ODOC, she was placed in the "meat room" in the kitchen. This was a triggering moment for plaintiff as it reminded her of her underlying crime. According to multiple Behavioral Health Services (BHS) mental health progress notes, plaintiff experienced increased anxiety and stress, coupled with hypervigilance and trauma-related nightmares related to this placement.

### 64.

Toward the end of 2013, plaintiff was placed on the mental health unit (MHU-D Unit). Due to her age, CCCF officials felt that she was highly impressionable, and it was prudent to shelter plaintiff from other influential AICs. In 2014, plaintiff's anxieties and nightmares continued. In response, BHS prescribed hydrocodone in an attempt to quell plaintiff's increasing PTSD related symptoms. Despite efforts to confront her PTSD, CCCF failed to protect plaintiff from the advances of Correctional Officers (CO).

### 65.

Plaintiff was housed on D-Unit which was staffed by Edgar Mickels, a 50-year-old correctional officer, and CO Wells who was posted in the bubble. From 2015 to 2016, plaintiff

was subjected to the sexual advances of COs Mickels and Wells. CO Mickels encouraged plaintiff to engage in a sexual relationship with CO Wells. Conversely, CO Wells facilitated the inappropriate relationship between CO Mickels and plaintiff.

**66.**

Initially, CO Mickels encouraged AIC Hanna Kiss and plaintiff to engage in sexual behavior so that he could observe them together. CO Mickels sent highly sexualized notes to both Kiss and plaintiff detailing his fantasies.

**67.**

CO Mickels sexually abused plaintiff on at least three different occasions. On two occasions, CO Mickels subjected plaintiff to groping and intense kissing. A third incident included touching of intimate body parts and mutual oral sex which took place in the closet by the upstairs showers.

**68.**

Reeling from the sexual abuse by CO Mickels, on August 24, 2015, plaintiff began cutting. This was her first incidence of self-harm, logged by ODOC. Plaintiff described feeling anxious, alone and angry. On November 20, 2015, plaintiff attempted to take her own life by tying a sock around her neck. After receiving an evaluation from BHS and despite BHS counselor's knowledge of CO Mickels' inappropriate relationships with AICs, plaintiff was returned to her cell on D-Unit and to CO Mickels. CO Mickels continued working on D-Unit. To cope, plaintiff continued to engage in self-harm. Finally, in February of 2016, CO Mickels was arrested and charged with official misconduct for sexual acts against female AICs.

**69.**

Throughout 2016, plaintiff experienced an increase in trauma-related flashbacks, continued

to engage in self-harm and struggle with suicidal ideations. On June 6, 2017, plaintiff reported feeling depressed and hopeless. The sexual abuse she suffered made her feel that she was not in control of her own body. As a result, plaintiff again attempted suicide by tying a sock around her neck. A BHS Mental Status Screening after the incident indicated she did not meet the qualifications for serious mental illness. Once again, plaintiff was returned to her unit.

**70.**

On July 20, 2017, after another event that triggered her PTSD, plaintiff again attempted to kill herself. She made two very significant cuts to her arm with a razor blade and swallowed the razor blade. Plaintiff, feeling remorseful, notified CO Thomas that she had harmed herself. She was immediately transported to the hospital. The razor blade was removed the following day without complications, she received stitches for her injuries and was admitted to the mental health infirmary (MHI). There she was prescribed Cymbalta for anxiety and depression.

**71.**

After her recovery, plaintiff was given a job on floor crew. She enjoyed the work, her supervisor Ms. Fitz, and seemed to be proud of her accomplishments. Plaintiff worked on floor crew for approximately 18 months.

**72.**

In November of 2017, plaintiff reported foot numbness traveling up her right leg to the right side of head. In December, she began to ambulate with a limp on her right side; She also reported experiencing a foot drop. This was a significant setback to her mental health as plaintiff relied on physical activity in the form of jogging, playing basketball and lifting weights to maintain mental stability.

**73.**

No longer able to walk properly and the one thing she enjoyed taken from her—physical activity—coupled with the helplessness she still felt over the sexual abuse from CO Mickels, plaintiff again attempted suicide by swallowing 60 Remeron tabs and 60 Lexapro. She was admitted to the Emergency Department at Meridian Park Legacy Health for suicidal behavior, and was diagnosed with major depressive disorder, anemia, and hypokalemia.

**74.**

December of 2018, plaintiff was held in D-Unit and was supposed to be transferred to H-Unit. Instead, plaintiff was transferred to C-Unit. Plaintiff did not feel it was safe to be on C-Unit and requested placement on H-Unit. Plaintiff and AICs, Brittney Endicott, Racina Allen and Ketra Hale attempted to persuade staff that H-Unit was a more appropriate placement for plaintiff. Plaintiff tried to persuade CO's Berringer, Ross, Imhoff, Yanez, Kerr, and Barkell to allow her to go to H-Unit. She also tried to go through her work supervisor, Ms. Fitz, and her mental health provider, Mohammed, to get a transfer from C-Unit to H-Unit. Plaintiff also spoke to her counselor about getting to H-Unit. All attempts to avoid C-Unit failed.

**75.**

The illegal activities of C-Unit corrections staff were well known throughout the institution and plaintiff did not want to be involved in what was happening on C-Unit. She again requested transfer off C-Unit to COs Bruns, Yanez, and Wilson. Her request for transfer to H-Unit was ignored and she remained on C-Unit.

**76.**

Beginning in late December 2018, defendant Alberts was the 5-day C-Unit officer. He worked from 2:00 p.m. – 10:45 p.m. Corporal Ross worked with defendant Alberts a majority of

the time. Ross and Alberts were friends outside of work and would vacation together.

**77.**

Defendant Alberts frequently made racist comments to plaintiff. For example, telling plaintiff to turn off her "nigger music". Defendant Alberts also commented while plaintiff was doing pull-ups, stating that the only reason she could do pull-ups was because she has extra testosterone because she is a "nigger". At that time, defendant Alberts was also consistently being reprimanded for spending too much time with AIC Mariah (aka Maria) Molina.

**78.**

Also, during this time, defendant Alberts allowed an altercation between Black AICs to go too far because he wanted to clear the unit of Black people. Defendant Alberts said that he was tired of "dealing with their loud mouths" and he wanted to "clean up the unit". These comments are documented in text messages. The involved AICs were all sanctioned and sent to DSU for their participation in that fight. Defendant Alberts attempted to use plaintiff to assault other AICs on C-Unit by telling plaintiff that certain AICs were snitches. This was a clear attempt to encourage plaintiff to assault other AICs.

**79.**

Between December of 2018 and June of 2019, defendant Alberts continued to make racial remarks to plaintiff. Defendant Alberts threatened to send plaintiff to Georgia where she would "wear a cotton dress". Defendant Alberts also threaten to send plaintiff to "pick cotton" and say that plaintiff was "tainted" because she was "a nigger". Defendant Alberts accused plaintiff of being in a relationship with AIC Molina; he told AIC Molina that he could not be in a relationship with her because plaintiff had "tainted her". Defendant Alberts would instruct plaintiff not to share drinks with AIC Molina, because this would "taint" AIC Molina. Conversely, he would instruct

AIC Molina not to share drinks with plaintiff for the same reason.

**80.**

Defendant Alberts wanted AIC Molina to masturbate in front of him when he did cell checks. AIC Molina was uncomfortable doing this; plaintiff confronted defendant Alberts about this request. Defendant Alberts threatened plaintiff with physical violence and told her to stay out of his relationship with AIC Molina. In December of 2018, plaintiff consistently tried to get off of C-Unit, requesting transfer off of the unit from COs Yanez, Wilson, and Bruns.

**81.**

In March 2019, while engaged in a sexual encounter with Ms. Molina, defendant Alberts required plaintiff to "keep jigs"—keep watch—for him while he sexually abused AIC Molina. While plaintiff was "keeping jigs," she was also cleaning and standing in front of the closet door. Defendant Alberts touched plaintiff on the elbow and motioned for her to join him and AIC Molina in the closet.

**82.**

Against her will, plaintiff performed oral sex on defendant Alberts. Plaintiff felt horrible about the situation and did not want to be part of defendant Alberts' sexual act; she felt disgusted and disrespected. During this time, defendant Alberts consistently threatened to transfer plaintiff out of state; plaintiff's only support system is in Oregon. Plaintiff felt like she did not have a choice whether or not to engage in sexual actions with defendant Alberts. Defendant Alberts was constantly commenting on and degrading her physical appearance, referring to her hairstyle as "nigger braids".

**83.**

At the end of February or early March of 2019, defendant Alberts threatened plaintiff with

a disciplinary rule violation: he was not going to mark the search of Ms. Crabtree's cell so that CO Kilgore would do a search the next day. Defendant Alberts insinuated that he had hid pills in plaintiff's cell for CO Kilgore to find.

**84.**

During this same search, plaintiff's toothbrush was moved. Defendant Alberts would do sinister things like move plaintiff's toothbrush, so that she would know defendant Alberts could do anything he wanted in her cell. In an attempt to distance herself from defendant Alberts and work on her personal issues, in March or April of 2019, plaintiff started a program that provided her insight into her wellbeing.

**85.**

In April of 2019, the staff rotated pursuant to the 6-month rotation schedule. Defendant Alberts was assigned to J/K-Unit and the men's unit. However, defendant Alberts consistently found his way onto C-Unit by trading posts with other correctional officers. This insured that defendant Alberts could keep track of plaintiff. Plaintiff continued to live in fear of what defendant Alberts would do to her.

**86.**

Between April and May 2019, after defendant Alberts saw plaintiff visiting with her friend from high school, Tre—a large black man with dreadlocks—defendant Alberts asked plaintiff how AIC Molina felt about plaintiff visiting a "monkey with dreads."

**87.**

To further intimidate plaintiff, defendant Alberts hid a razorblade in the light in plaintiff's cell. Plaintiff's roommate, Adela Morales, received a misconduct report and cell-in for possession of the razorblade. Also, in April and May of 2019, defendant Alberts threatened plaintiff and tried

to provoke plaintiff into a physical fight with him.

**88.**

Throughout this time, defendant Alberts would try to get plaintiff to "take out" snitches and "tax" wealthy AICs. Using the prison computer system, defendant Alberts would identify snitches and AICs with money, he would then attempt to get plaintiff to beat up those individuals or encourage her to find other AICs to beat up the alleged snitches. Defendant Alberts offered to pay AICs with drugs.

**89.**

During the end of April and May 2019, plaintiff worked with a fellow African American AIC. Alberts was upset with this and commented, "I only have room for one mixed bitch in my life."

**90.**

On one occasion, when defendant Alberts needed to talk to plaintiff, defendant Alberts waited outside in the parking lot for plaintiff's visitor to leave. He then went in to CCCF and stopped plaintiff in the corridor to talk to her. Defendant Alberts constantly monitored plaintiff's movements and the movements of her visitors. During this same time frame, defendant Alberts was consistently encouraging plaintiff to engage in a sexually explicit relationship with defendant Battin. Defendant Alberts set up clandestine meetings between plaintiff and defendant Battin, but plaintiff found excuses not to participate.

**91.**

On May 2, 2019, an investigation was initiated looking into defendant Alberts' illegal activity. After the launch of the investigation, defendant Alberts forced plaintiff to have sex with him in the closet in the main corridor. Plaintiff did not feel that she had a choice in whether or not

to engage in sexual contact with defendant Alberts. He would later brag that he was the "dick of the decade" because plaintiff had not had sex with a man in a long time. Had CCCF/ODOC staff promptly and properly acted on defendant Alberts' overt, inappropriate and illegal conduct, the incident between plaintiff and defendant Alberts would not have occurred.

### 92.

On or about June 6, 2019, defendant Alberts was escorted off the CCCF premises and 30 female AICs were taken in for disciplinary rule violations in connection with the illegal drugs defendant Alberts was supplying to the prison. Plaintiff was included in this number.

### 93.

On June 7, 2019, plaintiff was transferred to the Washington County Jail for a body scan in connection with the newly opened investigation. There, the scanner detected metal in the area of her stomach. Plaintiff was transferred back to the rescreening and discharge area of CCCF and required to consent to medical treatment. From CCCF, she was transferred to Meridian Park for an x-ray. The x-ray indicated that nothing metal was inside of her. After the x-ray, Special Investigation Unit (SIU) investigator Ms. Plumber and an unidentified woman, convinced the attending physician to conduct a vaginal search of plaintiff.

### 94.

After refusing to consent to the vaginal search, Ms. Plumber threatened plaintiff that she would be in a dry cell for as long as it would take to pass whatever was in plaintiff's body if plaintiff refused to consent to a search. After Plumber's threats, plaintiff agreed to the cavity search. Plaintiff was upset and crying during the exam, explaining that there was nothing inside of her. No foreign objects were found inside of plaintiff. Plaintiff returned to CCCF at 10:00 p.m. on June 7, 2019. She was placed in a dry cell, under close supervision, even though she had agreed to

the search. On June 8, 2019, at approximately 1:00 p.m., plaintiff received word that she was off supervision/dry cell, but her visits and phone calls were taken away.

**95.**

Between June 6, 2019 and November 15, 2019, plaintiff was held in administrative segregation for investigative purposes. During the investigation, plaintiff was disciplined through confiscation of her property and denial of her visits and phone privileges. She kyted regarding her canteen items and talked to SIU about the issues she was having with her property. SIU returned the kyte to her without resolving the issues. Plaintiff also sent a kyte regarding the denial of visits and phone calls. Plaintiff kyted SIU to determine who authorized the vaginal exam, SIU kyted back and said that they were not in charge of the investigation nor could they give her any information. As such, plaintiff was unable to appropriately grieve the improper body cavity search. In addition, plaintiff was not afforded programing because she was told by prison officials that she was not allowed to talk about defendant Alberts' actions due to the ongoing investigation.

**96.**

On November 15, 2019, the FBI spoke with plaintiff, she was read her Miranda Rights by the FBI agent and stated that she wanted an attorney. During her time in segregation, plaintiff's mail and possessions were being held, she could not access the addresses she needed to request help. Plaintiff was unable to contact an attorney as she did not have access to a phone or phonebook. Prison administration did not assist in helping her contact an attorney or other advocate.

**97.**

On or about November 22, 2019, plaintiff was given a disciplinary report (DR) for racketeering, contraband, possession of drugs, distribution, possession of an electronic device and

misuse of an information system (using Telemate to gain financially). On November 26, 2019, plaintiff was sanctioned to 180-days in DSU as punishment. This sanction came with 14 days LOP, a $100 fine, and visits behind glass for 365 days. Plaintiff was inappropriately sanctioned for the actions of a correctional officer—an officer who forced plaintiff to engage in criminal activity or face physical, sexual, and emotional harm.

**98.**

Before plaintiff's disciplinary hearing, plaintiff understood from CO Popoff that she would get an IMU packet after her sanction ended. After the hearing, plaintiff was moved to the Disciplinary Segregation Unit (DSU) where she remained until December 3, 2019. While in DSU, plaintiff spoke with the BHS counselor. This counselor's only job was to decide what packets plaintiff should do; the counselor did not provide counseling or a packet, and instead asked if plaintiff wanted to participate in the BHS class while in DSU. After her sanction was complete, plaintiff was transferred to IMU status. Plaintiff was provided a counselor while in IMU. However, the IMU counselor was Jennifer Elgen, defendant Battin's wife. This counseling was not PREA related and did not address the abuse by CCCF correctional officers.

**99.**

Plaintiff said she wanted to participate in the BHS class mandated by IMU counselor Ludlow. However, per Captain Wilson's orders, the BHS counselor was not to ask why plaintiff was in IMU. Captain Wilson told plaintiff, "don't talk to the counselor about anything, because there is still an active investigation." Ludlow restricted plaintiff from talking about her sexual abuse, stating that she did not want to get subpoenaed. Plaintiff was not provided any PREA counseling and was not provided a PREA advocate until the end of December 2019.

**100.**

On or about December 3, 2019, plaintiff—scared of retaliation and physical violence—requested a PREA advocate but was not afforded one. Again, plaintiff did not want Ms. Elgen to be her counselor because Battin had attempted to initiate a sexual relationship with plaintiff and made inappropriate comments to her.

**101.**

Sometime between December 25, 2019 and January 1, 2020, Amanda Cole, a PREA advocate, spoke with plaintiff. This meeting was held in the back of the visiting area using the general-visit phones.

**102.**

In early January 2020, the Statesman Journal was contacted regarding plaintiff's abuse. Plaintiff was being punished for being a victim and felt that no one was willing to help her. She believed that if the situation at CCCF was reported on in the media, someone would take notice and come to her aid. On January 16, 2020, plaintiff was transferred from CCCF to the Marion County Jail. On March 12, 2020, plaintiff was transferred from Marion County Jail to Grant County Jail. Both transfers came as a shock to plaintiff. These abrupt transfers triggered intense anxiety and fear.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Cruel and Unusual Punishment – Sexual Battery**

**42 U.S.C § 1983 – Violation of Eighth Amendment**

**(Defendants Mickels, Wells, Alberts and Battin)**

**103.**

Plaintiff re-alleges each and every allegation of paragraphs 1 through 102, and incorporates those allegations herein by this reference.

**104.**

Sexual assault on an AIC is deeply offensive to human dignity and is cruel and unusual punishment under the Eighth Amendment. AICs have a clearly established Eighth Amendment right to be free from sexual abuse. Sexual abuse of an AIC also constitutes excessive force and violates the Due Process Clause of the Fourteenth Amendment.

**105.**

Plaintiff is entitled to be held in a safe and humane conditions of confinement throughout her incarceration. Plaintiff is entitled to be free from unwanted and unwarranted sexual touching and abuse. She is entitled to her own personal bodily integrity pursuant to the parameters of the Eighth and Fourteenth Amendments to the United States Constitution. Plaintiff is also entitled to a to be safe and secure from undue and excessive force while in custody.

**106.**

The acts and omissions of defendants Mickels, Wells, Alberts and Battin violated plaintiff's protected rights and were an excessive intrusion onto her person without just cause and amounted to deliberate indifference to plaintiff's protected rights and her own personal safety. Defendants violated the requirements of the Eighth and Fourteenth Amendment rights held by plaintiff through the use of excessive force, intentional and abusive sexual assault and subjecting her to unsafe and inhumane conditions of confinement.

**107.**

The specific acts of defendants Mickels, Wells, Alberts and Battin individually and alleged to be deliberately indifferent are more particularly set forth below:

1) Defendant Wells attempted to physically restrain, sexually touch or cause serious bodily harm and significant mental distress to plaintiff. The actions of defendant Wells against plaintiff occurred in 2015–2016.

2) Defendant Mickels physically restrained, sexually touched or caused serious bodily harm and significant mental distress to plaintiff. The actions of defendant Mickels against plaintiff occurred between 2015–2016.

3) Defendant Battin attempted to physically restrain, sexually touch or cause serious bodily harm and significant mental distress to plaintiff. The actions of defendant Battin against plaintiff occurred in 2019.

4) Defendant Alberts physically restrained, sexually touched or caused serious bodily harm and significant mental distress to plaintiff. The actions of defendant Alberts against plaintiff occurred between March 2019 and June of 2019.

5) The actions of defendant Alberts violated every definition of sexual abuse of an AIC by a staff member as set forth in ODOC Policy 40.1.13.II.G.

6) The actions of defendant Mickels violated every definition of sexual abuse of an AIC by a staff member as set forth in ODOC Policy 40.1.13.II.G

7)    The actions of defendant Battin violated at least one of the enumerated definitions of sexual abuse of an AIC by a staff member as set forth in ODOC Policy 40.1.13.II.G.

8)    The actions of defendant Wells violated at least one of the enumerated definitions of sexual abuse of an AIC by a staff member as set forth in ODOC Policy 40.1.13.II.G.

9)    The actions of defendants Alberts and Battin were in violation of existing correctional standards, the United States Constitution, and state and federal laws and rules.

10)    The actions of defendants Mickels and Wells were in violation of existing correctional standards, the United States Constitution, and state and federal laws and rules.

**108.**

Defendant Alberts violated all of the enumerated acts of sexual abuse against plaintiff. Defendant Alberts used his position of power to abuse plaintiff, a vulnerable victim trapped under his supervision. Defendant Alberts' actions were not only criminal but also placed plaintiff, as well as other AICs and correctional staff, in harm's way. Defendant Battin sexually abused plaintiff in his attempt to engage in numerous prohibited sexual contacts.

**109.**

Defendant Mickels violated all of the enumerated acts of sexual abuse against plaintiff. Defendant Alberts used his position of power to abuse plaintiff, a vulnerable victim trapped under his supervision. Defendant Mickels' actions were not only criminal but also placed plaintiff, as

well as other AICs and correctional staff, in harm's way. Defendant Wells sexually abused plaintiff in his attempt to engage in numerous prohibited sexual contacts.

**110.**

Defendants Peters, Belleque, Gower, Steward and Perrson know of various technology security solutions that would aid in the prevention and deterrence of sexual assault in prisons. Technology exists to allow correctional facilities to track AIC and staff movement around the clock. The system alerts the institution if a staff member were alone with an AIC within a particular area of the institution. This system would have easily monitored defendant Mickels, Wells, Alberts and Battin's movements within CCCF.

**111.**

As a result of the violations of the Constitutional standards set forth herein, plaintiff suffered physical assaults to her person, severe emotional trauma from the ongoing assaults and threats, and a significant deterioration in her mental state causing her to become severely depressed. She was isolated, helpless and disregarded. As a result of the violations of the Constitutional standards set forth herein, plaintiff has suffered from forms of stress, depression, anxiety and an exacerbation of her underlying problems from early sexual abuse. The acts and omission of defendants, taken under color of law, constituted deliberate indifference and violated plaintiff's right under the Eighth Amendment to the United States Constitution.

**112.**

As a result of the violations of the constitutional standards set forth herein, plaintiff continues to suffer from anxiety, stress, anger, hopelessness, depression and ongoing battles with stress.

**113.**

As a result of the violations of the United States Constitution, plaintiff seeks economic and noneconomic damages in a sum to be more fully determined at trial but no less than $5,523,622.61. Plaintiff seeks punitive damages against defendants.

**114.**

All defendants' conduct was well defined by law and each defendant knew or reasonably should have known that their conduct both below the standard prescribed by law herein but also was illegal.

**SECOND CLAIM FOR RELIEF**

**Deprivation of Federal Civil Rights**

**Cruel and Unusual Punishment**

**Unlawful Strip Searches**

**(T. Plumbers and Does)**

**115.**

Plaintiff re-alleges each and every allegation of paragraphs 1 through 114, and incorporates those allegations herein by this reference.

**116.**

On June 7, 2019, plaintiff was placed in a close-supervision dry cell, meaning that her movements were constantly monitored by a correctional officer sitting outside her cell and by a camera equipped in her cell. The cell was not equipped with water and she used a commode equipped with a plastic bag to collect her urine and feces for inspection.

**117.**

OAR 219-041-0020 provides that AICs may be subject to search at any time; "but not more frequently than is necessary to control contraband or to recover stolen or missing property[.]"

**118.**

By report, on June 7, 2019 plaintiff was subjected to the following:

1)  June 7, 2019 – 1st body scan at Washington County Jail indicating metal was detected

2)  June 7, 2019 – 2nd body scan at Meridian Park Emergency Department indicating no metal detected

3)  June 7, 2019 – 1st vaginal search indicating nothing was inside plaintiff.

4)  June 7, 2019 at approximately 10:00PM – plaintiff is placed under close supervision and in a dry cell despite nothing found during x-ray and vaginal search.

**119.**

As a result of the violations of the constitutional standards set forth herein, plaintiff suffered forcible, non-consensual and physical assaults to her person, severe emotional trauma from the ongoing assaults and threats, and a significant deterioration in her mental state causing her to become severely depressed. Plaintiff suffered extreme fear while the assaults were occurring which was made worse because she knew or believed that no one would stop the strip and cavity searches. She was isolated, helpless and disregarded. As a result of the violations of the constitutional standards set forth herein, plaintiff has suffered from forms of stress, depression, anxiety and an exacerbation of her underlying problems from early sexual abuse.

**120.**

Defendants used vaginal and rectal exams to punish plaintiff.

**121.**

As a result of the violations of the Constitutional standards set forth herein, plaintiff continues to suffer from post-traumatic anxiety, stress, anger, hopelessness, depression, fear, shame, ongoing battles with stress, and loss and deprivation of plaintiff's liberty.

**122.**

All defendants' conduct was well defined by law and each defendant knew or reasonably should have known that their conduct was not only well below the standard prescribed by law herein, but was illegal per se.

**123.**

As a result of the violations of the United States Constitution, plaintiff seeks economic and noneconomic damages in a sum to be more fully determined at trial but no less than $5,523,622.61. Plaintiff seeks punitive damages against defendants.

**124.**

The acts and omission of defendants, taken under color of law, constituted deliberate indifference and violated plaintiff's right under the Eighth Amendment to the United States Constitution.

**THIRD CLAIM FOR RELIEF**

**Deprivation of Federal Civil Right**

**Failure to Protect**

**(42 U.S.C §§ 1983, 1985)**

**(All Defendants)**

**125.**

Plaintiff re-alleges each and every allegation of paragraphs 1 through 124, and incorporates those allegations herein by this reference.

**126.**

Plaintiff, as a prisoner confined to a correctional facility, is entitled to be provided the essential aspects of a safe, sanitary and humane confinement including protection from harms and threats to her safety and security under the laws of the State of Oregon and the Eighth Amendment to the United States Constitution.

**127.**

Plaintiff is entitled to the full protection of the laws including the Prison Litigation Reform Act and the Prison Rape Elimination Act which requires ODOC and defendants to comply with the laws in providing protection from assault including rape, providing protection to vulnerable AICs, and to comply with all aspects of intervening and providing a safe environment to plaintiff.

**128.**

Defendants violated the constitutional and statutory rights held by plaintiff in the following ways:

    1)    Failure to timely investigate defendant Alberts' actions;

2)     Failure to timely investigate defendant Battin's actions;

3)     Failure to timely investigate defendant Mickels; actions;

4)     Failure to timely investigate defendant Wells' actions;

5)     Failure to provide adequate supervision and training for staff;

6)     Failure to provide adequate safeguards and protections for AICs from defendants Mickels, Wells, Alberts and Battin;

7)     Failure to respond to obvious signs that defendant Alberts was grooming plaintiff, and displayed sexual predator patterns which were known to many staff members including security staff and management at CCCF;

8)     Failure to respond to obvious signs that defendant Battin was attempting to sexually abuse plaintiff, and displayed sexual predator patterns which were known to many staff members including security staff and management at CCCF;

9)     Failure to provide legally mandated counseling as required by provisions of the PREA for the benefit and protection of plaintiff;

10)    Lack of concern for security and premises defects at CCCF. Defendant's Mickels, Wells, Alberts and Battin had access to various secluded areas of CCCF that were known as areas of illegal activity and were not equipped with adequate and properly placed monitoring systems;

11)    Knowledge of defendant Alberts' actions and their failure to take immediate action to stop defendant Alberts' actions;

12)    Knowledge of defendant Mickels' actions and their failure to take immediate action to stop defendant Mickels' actions;

13) Knowledge of actions and their failure to take immediate action to stop defendant Battin's actions;

14) Knowledge of actions and their failure to take immediate action to stop defendant Wells' actions;

15) Failure to protect plaintiff from sexual harassment and intimidation from correctional officers;

16) Failure to preserve evidence of defendant Alberts' actions, by failing to preserve video surveillance of C-Unit, D-Unit, hallway, closet and the staff bathroom;

17) Failure to comply with the mandates set forth in PREA, including but not limited to meeting with plaintiff 30, 60, and 90 days after the incident;

18) Failure to comply with the mandates set forth in PREA, including but not limited to advising plaintiff that she could have an advocate present during all interviews;

19) Punishment of plaintiff for actions of corrupt correctional officers;

20) Unwarranted strip searches of plaintiff;

21) Failure to ensure that plaintiff's conditions of confinement complied with constitutional standards.

**129.**

As a result of the behaviors of the defendants herein plaintiff suffered repeated sexual assault, was placed in constant fear for her safety, could not meet with advocates, was denied abuse counseling, could not safely access medical care, could not safely access legal counsel, was housed

in inhumane conditions, suffered repeated verbal abuse and her underlying anxiety and PTSD were severely exacerbated.

### 130.

As a result of the violations of the United States Constitution, plaintiff seeks economic and noneconomic damages in a sum to be more fully determined at trial but no less than $5,523,622.61. Plaintiff seeks punitive damages against defendants.

### 131.

The acts and omission of defendants, taken under color of law, constituted deliberate indifference and violated plaintiff's right under the Eighth Amendment to the United States Constitution.

**FOURTH CLAIM FOR RELIEF**

**Deprivation of Federal Civil Right**

**Failure to Supervise**

**(42 U.S.C §§ 1983, 1985)**

**(Sage, Belleque, Peters, Gower, Doran, Rose, Wilson, Steward, Myer, Doe Defendant Assistant Superintended of Security at CCCF, Doe Defendants)**

### 132.

Plaintiff re-alleges each and every allegation of paragraphs 1 through 131, and incorporates those allegations herein by this reference.

### 133.

The constitutional deprivations suffered by plaintiff are the proximate and direct cause of a non-interested, indifferent, and willfully ignorant supervisory practice by the named defendants.

The supervisors have a constitutional duty to protect prisoners and to provide them with safe and humane conditions of confinement including the right to be free from sexual abuse and assault by staff. This duty imposed on supervisory staff includes the obligation under the law to fully investigate claims of sexual misconduct by staff against prisoners, the mandatory duty to report and address claims of sexual assault on prisoners, the duty to maintain a good and constant supervision of male staff supervising female prisoners, and the duty to ensure that AICs are held in constitutionally adequate conditions. The duty is enhanced when the prisoner population is especially vulnerable particularly if they are smaller, physically weaker, more vulnerable because of past sexual abuse and their ability to be easily abused.

**134.**

The constitutional deprivations committed by the supervisory staff were long-standing and in the face of several years of obvious and notable signs about the predatory habits of defendant's Mickels, Wells, Alberts and Battin, such as their ability to set their own schedules, roam the facility at will, pull AICs from their housing units during off hours, have unchaperoned access to women, exhibiting sexualized behaviors, their failure to follow recommended guidelines for interactions with AICs, their lack of accountability, numerous rumors and innuendo, and a complete lack of investigation and follow up.

**135.**

The supervisory staff failed in the following particulars:

1) Failed to implement adequate AIC monitoring and managing process after the repeated sexual violations at CCCF noted above;

2) Failed to provide adequate safeguards to keep AICs from meeting alone with staff;

**41 – COMPLAINT**

3)    Failed to note and respond to evidence of abuse, and the obvious and clear record of a serial predatory sex offenders;

4)    Refused to take action because they purposefully disregarded the complaints of AICs, did not believe anyone would care about the wellbeing of the AICs, did not believe anyone would believe AICs, and generally allowed defendant Alberts to thrive in plain sight;

5)    Treated the AICsas if they deserved the abuse they received. If any one of the supervisory staff had followed through on the complaints and obvious signs of abuse, the plaintiff in this action would not have been sexually assaulted or abused;

6)    Tolerated if not encouraged an atmosphere of bullying, threatening and retaliating against AICs who came forward with concerns about the sexual behavior of staff;

7)    Tolerated and encouraged staff to take proactive measures to discourage complaints about sexual behaviors;

8)    Refused to allow plaintiff access to legal mail and legal counselors, searched legal mail, instructed grievances to be denied and delayed for arbitrary reasons; Supervisors have taken an informal policy approach that the staff members are more important than AICs and must be protected from any and all complaints by prisoners; and

9)    Issued orders that the victim of defendant's Mickels, Wells, Alberts and Battin would not receive the guarantees of federal and state law including mental health counseling, access to their chosen PREA advocate or

adequate conditions of confinement.

**136.**

Furthermore, the supervisory staff failed plaintiff by failing to institute national standards for prison security by failing to inspect staff members coming and going from prison, failing to stop the introduction of contraband into the prison by staff, failing to follow up on location and work production by subordinate staff, failing to demand accountability by subordinate staff, and failing to have safe and adequate investigative procedures for complaints made by prisoners toward staff.

**137.**

As a result of the unconstitutional practice by supervisors which was promoted, allowed or facilitated within CCCF, female informants, witnesses or victims of sexual abuse were ignored, or retaliated against for filing complaints of sexual abuse.

**FIFTH CLAIM FOR RELEIF**

**Deprivation of Federal Civil Right**

**Failure to Protect, Cruel and Unusual Punishment, and CCCF's liability for the actions of its employees**

**(42 U.S.C § 1983 – Violation of Eighth Amendment)**

**(All Defendants)**

**138.**

Plaintiff realleges all previous paragraphs and incorporates those allegations set forth herein.

**43  – COMPLAINT**

**139.**

Defendants have deprived plaintiff of her constitutional rights within the meaning of Section 1983 when they participated in defendant Mickels', Wells', Alberts' and Battin's affirmative acts of sexual abuse against plaintiff, and when they omitted performing an act which they are legally required to do that causes the deprivation.

**140.**

Here, CCCF/ODOC officials had knowledge of, ignored, acquiesced and facilitated the unconstitutional action of subordinate officials and correctional officers. The specific liabilities are as follows:

1) Failure to timely investigate defendant Alberts' actions;

2) Failure to timely investigate defendant Battin's actions;

3) Failure to timely investigate defendant Mickels' actions;

4) Failure to timely investigate defendant Wells' actions;

5) Failure to provide adequate supervision and training for staff;

6) Failure to provide adequate safeguards and protections for AICs from defendant Alberts;

7) Failure to provide adequate safeguards and protections for AICs from defendant Battin;

8) Failure to provide adequate safeguards and protections for AICs from defendant Mickels;

9) Failure to provide adequate safeguards and protections for AICs from defendant Wells;

10) Failure to respond to obvious signs that defendant Alberts was grooming plaintiff, and displayed sexual predator patterns which were known to many staff members including security staff and management at CCCF;

11) Failure to respond to obvious signs that defendant Mickels was grooming plaintiff, and displayed sexual predator patterns which were known to many staff members including security staff and management at CCCF;

12) Failure to respond to obvious signs that defendant Battin was attempting to sexually abuse plaintiff, and displayed sexual predator patterns which were known to many staff members including security staff and management at CCCF;

13) Failure to respond to obvious signs that defendant Wells was attempting to sexually abuse plaintiff, and displayed sexual predator patterns which were known to many staff members including security staff and management at CCCF;

14) Failure to provide legally mandated counseling as required by the provisions of the PREA for the benefit and protection of plaintiff;

15) Lack of concern for security and premises defects at CCCF. Defendant's Alberts and Battin had access to various secluded areas of CCCF that were known as areas of illegal activity and were not equipped with adequate and properly placed monitoring systems;[1]

---

[1] This violated Ms. Crabtree's Eighth Amendment rights by creating an environment in which sexual misconduct was likely to occur. *Keith v. Koerner*, No. 15-3219, 843 F.3d 833 (10th Cir. 2016); "No County policy prohibited a single deputy of one sex from being alone with a prisoner of another sex. Nor were any monitoring devices, such as surveillance cameras, ever employed to supervise such one-on-one interactions." *Cash v. County of Erie*, No. 09-4371, 2011 U.S. App. Lexis 17163 (2nd Cir.); Prisoners' claims that the county knew or should have known that security cameras in the facility were non-functioning and improperly placed, and that aspects of the layout of the facility permitted guards to have unlimited, unmonitored access to prisoners to facilitate such assaults and

16) Lack of concern for security and premises defects at CCCF. Defendant's Mickels and Wells had access to various secluded areas of CCCF that were known as areas of illegal activity and were not equipped with adequate and properly placed monitoring systems;

17) Knowledge of defendant Alberts' actions and their failure to take immediate action to stop defendant Alberts' actions;

18) Knowledge of actions and their failure to take immediate action to stop defendant Battin's actions;

19) Knowledge of actions and their failure to take immediate action to stop defendant Mickels' actions;

20) Knowledge of actions and their failure to take immediate action to stop defendant Wells' actions;

21) Failure to protect plaintiff from sexual harassment and intimidation from correctional officers;

22) Failure to preserve evidence of defendant Alberts' actions, by failing to preserve video surveillance of C-Unit, D-Unit and the staff bathroom;

23) Failure to comply with the mandates set forth in PREA, including but not limited to meeting with plaintiff 30, 60, and 90 days after the incident.

24) Failure to comply with the mandates set forth in PREA, including but not limited to advising plaintiff that she could have an advocate present during all interviews.

25) Punishment of plaintiff for the actions of corrupt correctional officers.

---

harassment was sufficient to come within a statutory waiver of governmental immunity based on premises defects. *Campos v. Nueces County*, No. 13-03-724, 162 S.W.3d 778 (Tex. App. 2005).

**46 – COMPLAINT**

**141.**

The deprivations committed by the supervisory staff was longstanding and in the face of several years of obvious and notable signs about the predatory habits of defendants Mickels, Wells, Alberts and Battin, and their ability to set their own schedule, roam the facility at will, pull AICs from their housing units during off hours, have access to women without chaperones, exhibition of sexualized behaviors, failure to follow recommended guidelines for interactions with prisoners, lack of accountability, numerous rumors and innuendos, and a lack of investigation and follow-up.

**142.**

Furthermore, the supervisory staff failed plaintiff by failing to institute national standards for prison security by failing to inspect staff members coming and going from prison, failing to stop the introduction of contraband into the prison by staff, failing to follow up on location and work production by subordinate staff, failing to demand accountability by subordinate staff, and failing to have safe and adequate investigative procedures for complaints made by prisoners toward staff.

**143.**

As a result of the practices by ODOC supervisors—which were promoted, allowed, or facilitated within CCCF—female informants, witnesses or victims of sexual abuse were ignored, punished or retaliated against for filing complaints of sexual abuse. As a result of the behaviors of the defendants herein, plaintiff suffered repeated sexual assault, was placed in constant fear for her safety, feared meeting with advocates, was denied abuse counseling, could not safely access medical care, was held in unlawful conditions, subjected to unlawful strip searches and her underlying anxiety and PTSD were severely exacerbated.

47 – COMPLAINT

**FIFTH CLAIM FOR RELIEF: 14TH Amendment - Failure to Protect -**

**Deprivation of Federal Civil Right**

**Equal Protection**

**(42 U.S.C. §1983)**

**144.**

Plaintiff realleges each and every allegation of paragraphs 1 through 143, and incorporates those allegations herein by this reference.

**145.**

The Fourteenth Amendment's Equal Protection Clause requires a practice of equal of protection, by protecting all impartially—not drawing distinctions between individuals solely on differences that are irrelevant to a legitimate governmental objective.

**146.**

Here, plaintiff suffered racial epithets, harassment, verbal harassment in addition to unlawful actions including sexual battery. The constant racial slurs showered upon plaintiff were coupled with threats of physical violence and sexual victimization.

**147.**

Alberts' racial animus toward plaintiff and his other unlawful actions of personally sexually abusing Ms. Crabtree and attempting to allow other correctional officers to sexually abuse Ms. Crabtree is a violation of plaintiff's Fourteenth Amendment rights.

**SIXTH CLAIM FOR RELIEF: 8TH Amendment**

**Deprivation of Federal Civil Right**

**Cruel and Unusual Punishment**

**(42 U.S.C. §1983)**

**148.**

Plaintiff realleges each and every allegation of paragraphs 1 through 147, and incorporates those allegations herein by this reference.

**149.**

Plaintiff, as a prisoner confined to a correctional facility, is entitled to be provided the essential aspects of a safe, sanitary and humane confinement including protection from harms and threats to her safety and security under the laws of the State of Oregon and the Eighth Amendment to the United States Constitution.

**150.**

Here, plaintiff suffered racial epithets, harassment, verbal harassment in addition to unlawful actions including sexual battery. The constant racial slurs showered upon plaintiff were coupled with threats of physical violence and sexual victimization.

**151.**

Alberts racial animus toward plaintiff and his other unlawful actions of personally sexually abusing Ms. Crabtree and attempting to allow other correctional officers to sexually abuse plaintiff is violation of plaintiff's Eighth Amendment rights.

## SEVENTH CLAIM FOR RELIEF: 8TH Amendment

## Deprivation of Federal Civil Right

## Failure to Protect

## (42 U.S.C §§ 1983, 1985)

## (John and Jane Does)

### 152.

Plaintiff re-alleges each and every allegation of paragraphs 1 through 151, and incorporates those allegations herein by this reference.

### 153.

Plaintiff, as a prisoner confined to a correctional facility, is entitled to be provided the essential aspects of a safe, sanitary and humane confinement including protection from harms and threats to her safety and security under the laws of the State of Oregon and the Eighth Amendment to the United States Constitution.

### 154.

Plaintiff is entitled to the full protection of the laws including the Prison Litigation Reform Act and the Prison Rape Elimination Act which requires ODOC and defendants to comply with the laws in providing protection from assault including rape, providing protection to vulnerable inmates, and to comply with all aspects of intervening and providing a safe environment to plaintiff.

### 155.

Defendants violated the constitutional and statutory rights held by plaintiff in the following ways:

50 – COMPLAINT

1) Failure to timely investigate defendant Alberts' actions;

2) Failure to respond to obvious signs that defendant Alberts was using racial epithets, harassment and verbal harassment in addition to unlawful actions against plaintiff;

3) Failure to guarantee that all inmates were in a safe and secure environment when they worked and where they were housed and not face racial and sexual victimization.

**156.**

As a result of the behaviors of the defendants herein, plaintiff suffered repeated racial epithets, harassment, sexual assault, was placed in constant fear for her safety, and her underlying anxiety and PTSD were severely exacerbated.

**157.**

As a result of the violations of the United States Constitution, plaintiff seeks economic and noneconomic damages in a sum to be more fully determined at trial but no less than $5,556,591.93. Plaintiff seeks punitive damages against defendants.

**158.**

The acts and omission of defendants, taken under color of law, constituted deliberate indifference and violated plaintiff's right under the Eighth Amendment to the United States Constitution.

**EIGHTH CLAIM FOR RELIEF: Negligence**

**All Defendants and the State of Oregon**

**159.**

Plaintiff re-alleges each and every allegation of paragraphs 1 through 158, and incorporates those allegations herein by this reference.

**160.**

The statute and administrative rules govern the conduct and behavior expected by corrections staff toward AICs. Those expectations include zero tolerance for sexual contact between staff and AICs, properly training staff to recognize grooming behavior and how to detect, identify and stop sexual misconduct by staff toward AICs.

**161.**

The failures by the individual defendants and the State of Oregon to comply with well known, existing standards of conduct were the direct cause of the sexual battery suffered by plaintiff. The failure to adhere to known and expected standards was a deviation from the existing standard of care, and it was foreseeable that sexual assault against plaintiff would occur.

**162.**

As a result of the negligence and violations of the standard of care by the defendants and the State of Oregon, plaintiff was sexually battered, verbally abused, harassed and suffered significant emotional damages to her non-economic loss of no less than $5,556,591.93. Plaintiff will require further medical treatment for her worsening PTSD and anxiety brought on by the battery in the amount to be calculated at trial but no less than $100,000.00.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff respectfully prays that this Court will enter a judgment in her favor, and against defendants, as follows:

A.   Finding that any or all defendants violated her protected constitutional rights;

B.   Findings that as a result of the constitutional violations alleged herein plaintiff has sustained harm and damages in an amount no less than $5,556,591.93;

C.   Findings that the cause of the constitutional violations is intentional or so grossly and deliberately indifferent to justify the award of punitive damages against each named defendant in a sum no less than $100,000.00 each;

D.   Findings that Plaintiff will require further medical treatment in the amount no less than $100,000.00;

E.   Findings that plaintiff was subject to sexual assault as a result of the actions of individual in the employment of the State of Oregon;

F.   Findings that plaintiff was the subject to unlawful strip and cavity searches;

G.   For an award of economic and noneconomic damages in an amount to be proven at trial, but not less than $5,556,591.93;

H.   For an award of punitive damages in an amount to be proven at trial;

I.   Injunctive relief, ordering defendants and their agents and employees to require that plaintiff remain in Oregon for the balance of her incarceration;

**53 – COMPLAINT**

J.    For plaintiff's reasonable attorney fees, costs, and disbursements; and

K.    For such other relief as the law permits and justice requires.


DATED this 4th day of August, 2020.

Respectfully submitted,

/s/ Ginger G. Mooney
Ginger G. Mooney, OSB#: 031261
Attorney for Plaintiff